**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOSE RAMOS,

                                        Plaintiff,

            - v -                                               Civ. No. 9:09-CV-1046
                                                                      (GLS/RFT)
**MARYANN GENOVESE**, *Former Medical Director,*
*Sing Sing Correctional Facility,* **DOCTOR MILLER**,
*Hub Medical Director, Sing Sing Correctional Facility,*
**DOE(S)**, *Shawangunk Correctional Facility,*

                                        Defendants.

APPEARANCES:                                    OF COUNSEL:

**JOSE RAMOS**
85-A-5899
Plaintiff, *Pro Se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

**HON. ERIC T. SCHNEIDERMAN**              **BRIAN J. O'DONNELL, ESQ.**
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

        In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Jose

Ramos alleges that Defendants violated his Eighth Amendment rights by denying, delaying or

providing inadequate medical care for his serious medical need.  Dkt. No. 1, Compl.  Now before

this Court is Defendants' Motion for Summary Judgment filed pursuant to Federal Rule of Civil

Procedure 56(a). Dkt. No. 34. Defendants argue that summary judgment should be granted because:

(1) Plaintiff has failed to state a constitutional claim for deliberate indifference to any serious medical need; and (2) Defendants are entitled to qualified immunity. *See* Dkt. No. 34-7, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 37. For the reasons that follow we recommend that Defendants' Motion for Summary Judgment be **GRANTED.**

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more

than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II. DISCUSSION

### A. Material Facts

Except where noted, the following facts are undisputed.

At all times relevant in this action, Plaintiff was an inmate at Shawangunk Correctional Facility (hereinafter "Shawangunk"). *See* Compl. From October 1, 2007 until May of 2009,

Defendant Maryann Genovese, M.D., was the Facility Health Director at Shawangunk, and one of Plaintiff's treating physicians at the facility. Dkt. No. 34-2, Defs.' 7.1 Statement at ¶¶ 1 & 9. Beginning on March 21, 2008, Plaintiff also received care from Defendant Jon Miller, M.D., a part-time physician who provided medical care to inmates at Shawangunk as required. *Id.* at ¶¶ 8, 9, & 11. Dr. Miller is not a "Hub Medical Director" nor a Regional Medical Director ("RMD"), and he never supervised Dr. Genovese. *Id.* at ¶ 7. While incarcerated at Shawangunk, Plaintiff received treatment for several medical conditions including low back pain, psoriasis, shoulder problems, pulmonary problems, and foot problems. *Id.* at ¶ 9. However, it is the treatment of Plaintiff's low back pain that spawned the instant action. *See generally* Compl.

Medical care at Shawangunk is provided through a managed care health system. Defs.' 7.1 Statement at ¶ 2. Under this system, an inmate with a medical issue first meets with a registered nurse who identifies the inmate's medical issue(s) and reviews his or her medical history. *Id.* The nurse then performs triage, and assesses what medical services are required based on the nature of the inmate's complaint and the urgency of the inmate's medical needs. *Id.* If the nurse deems it necessary, an appointment can be made for the inmate to see a physician. *Id.* at ¶ 3. If a treating physician believes that an inmate requires specialized health care, *e.g.,* physical therapy, diagnostic tests such as a Magnetic Resonance Imaging test ("MRI"), or a consultation with an outside specialist, the physician can issue a request which is then reviewed by the Contracted Care Manager ("CCM"). *Id.* at ¶ 5. The physician can specify the urgency of the treatment in the request, *i.e.,* a physician can request that specialty care be provided "soon," meaning it is needed within two weeks, or "routine," meaning it can wait more than two weeks. *Id.* at ¶ 6. However, a request other than routine must include a specific medical reason for the urgency, or be changed to "routine." *Id.* The

CCM will either approve the request or refer it to a Regional Medical Director ("RMD") for a final determination of whether such care will be provided. *Id.* at ¶ 5.

On October 1, 2007, Plaintiff reported to Dr. Genovese that he was experiencing issues with his right shoulder, as well as numbness in his right leg. Dkt. No. 34-6, Brian J. O'Donnell, Esq., Affirm., dated June 1, 2012, Ex. 1, Certified Copy of Portions of Ramos's Ambulatory Health R. (hereinafter "AHR") at pp. 1 & 2. An MRI of Plaintiff conducted in 1998 and reviewed by Dr. Genovese revealed "spinal stenosis [] herniated disc." AHR at p. 2. On October 10, Plaintiff met with Dr. Genovese and complained of numbness in his right leg which was connected to pain in his "lumbosacral spine." They discussed Plaintiff's "progressive degenerative disc disease" and Dr. Genovese determined that Plaintiff would probably need another MRI.[1] Dkt. No. 34-3, Maryann Genovese, M.D., Aff., dated June 1, 2012, at ¶ 13; AHR at p. 3. Plaintiff was experiencing pain while walking or standing but the pain would go away while he was lying down. Pl.'s Opp'n at p. 8. On October 15, Dr. Genovese conducted some "clinical tests" on Plaintiff and concluded that he "probably had moderate to severe degenerative disc disease in his lumbosacral spine;" she then scheduled an MRI. Genovese Aff. at ¶ 14; AHR at pp. 4–5.

On November 20, 2007, Plaintiff underwent an MRI. *See* AHR at p. 7; Genovese Aff. at ¶

---

[1] Plaintiff makes an unsubstantiated claim that Dr. Genovese agreed to proscribe physical therapy for both his back and shoulder at this appointment. In his Opposition Plaintiff argues that Defendants have attempted to mislead this Court into believing that the physical therapy referral submitted on October 18, 2007, was for treatment of his lower back pain as well as his shoulder. Pl.'s Opp'n at pp. 5–8. Plaintiff's concern is understandable given the vague phrasing of Defendants' 7.1 Statement. Defs.' 7.1 Statement at ¶¶ 13–15. We have reviewed the record and conclude that the physical therapy referral submitted on October 18, was for Plaintiff's right shoulder, and not his lower back pain. *See* Genovese Aff. at ¶ 9; Miller Aff., Ex. 3, Contract for Specialty Care Appointments, at (unnumbered) pp. 33 & 34 (showing that when Dr. Genovese requested Plaintiff's consent for specialty care on October 1, she listed the type of care being consented to as "Physical Therapy Shoulder" on one of the forms, and "Arthroscopy Right Shoulder" on the other). As noted above, Dr. Genovese ordered an MRI following the October 10th appointment. Notwithstanding this misunderstanding between the parties, the Court has utilized October 1, 2007 as a starting point for reviewing Plaintiff's claims of deliberate indifference. *See infra* Part II. C.

15 & Ex. 5, MRI Report from Multi Diagnostic Serv. Inc. (hereinafter "2007 MRI Report"). The specialist that interpreted the MRI noted that Plaintiff presented a "[m]oderate central canal stenosis at L4-L5 . . . [and] [s]mall disc herniation on the right at L5-S1." 2007 MRI Report. Dr. Genovese discussed those results with Plaintiff on December 5. AHR at p. 7; Genovese Aff. at ¶ 15.

On February 1, 2008, Plaintiff went to sick-call complaining of chronic persistent pain. AHR at p. 10. On February 15, Plaintiff again reported to sick-call claiming he needed to see the doctor about his back pain; a doctor's appointment was made for February 26, 2008. *Id.* at p. 11. On February 26, Dr. Genovese confirmed her earlier diagnosis, recommended that Plaintiff attend physical therapy (hereinafter "PT"), and that he take Neurontin for the pain. *Id.* at pp. 11–12. Plaintiff agreed to go to PT, but agreed only to consider taking the Neurontin, stating that he did not want to report to medical in order to receive the medication. *Id.* at p 12. Dr. Genovese submitted a "routine" request for an initial evaluation with a physical therapist that was approved the next day. Genovese Aff., Ex. 6.

On March 21, 2008, Plaintiff met with Dr. Miller who performed a full physical checkup of Plaintiff. Defs.' 7.1 Statement at ¶ 11; AHR at pp. 14–15; Pl.'s Opp'n, Ex. 2, Lt. to Dr. Genovese, dated Apr. 7, 2008. Dr. Miller reviewed Plaintiff's medical records including Plaintiff's 1998 MRI, Miller Aff. at ¶ 8, and during the examination, Plaintiff reported experiencing "chronic back pain." AHR at p. 15.

On April 7, 2008, Plaintiff wrote a letter to Dr. Genovese explaining that he had not yet received any PT for his back. Pl.'s Opp'n, Ex. 2. On April 9, Plaintiff saw the Physical Therapist for an initial evaluation of his low back. Miller Aff., Ex. 3 at (unnumbered) p. 24. The Physical Therapist's report noted that Plaintiff "will benefit from on going PT for pain management" and

recommended PT twice a week, for four weeks.  *Id.* at (unnumbered) pp. 24 & 25.  The Physical

Therapist's report states, "please schedule ASAP" and the DOCCS computer printout notes that the

need for a followup was "urgent."  *Id.*  On April 22, Defendant Genovese submitted a request for

PT that mirrored the recommendation of the Physical Therapist, including the Physical Therapist's

recommendation that the care be provided "soon."  Genovese Aff. at ¶ 10 & Ex. 3 at (unnumbered)

p. 1.  The CCM denied this request noting "PLEASE PROVIDE MEDICAL RATIONALE FOR

'SOON' URGENCY OR CHANGE TO ROUTINE. REVIEW OF [PATIENT'S MEDICAL

RECORDS] INDICATES [PATIENT] HAS [HISTORY] OF CHRONIC LOW BACK PAIN."  *Id.*,

Ex. 3 at (unnumbered) pp. 1–2.  On May 1, the request was approved as "routine."  *Id.*, Ex. 4.

On May 14, 2008, Plaintiff wrote a letter to Dr. Genovese requesting an appointment and

informing her that although the Physical Therapist promised on April 9 that she would try and

schedule him for an appointment sometime that week, five weeks had passed and he still had not

seen the physical therapist.  Pl.'s Opp'n, Ex. 3, Lt. dated May 14, 2008.  On May 16, Plaintiff

reported to sick-call that he had not yet seen the Physical Therapist but, he was told that he was

already scheduled for physical therapy that day.  AHR at p. 18.  Beginning on May 16, Plaintiff

started receiving regular physical therapy treatments for his lower back pain including appointments

on May 21, 23, 28, and 30, as well as on June, 4, 6, and 11.  Pl.'s Opp'n at p. 8; Miller Aff., Ex. 3

at (unnumbered) pp.12 & 16–22.

Although he occasionally reported "some relief," "mild relief," or "temporary relief," from

the PT, Miller Aff., Ex. 3 at (unnumbered) pp. 12, 16,17,19, 20& 22, Plaintiff consistently told the

Physical Therapist that he was continuing to experience pain, *id.* at (unnumbered) pp. 12 & 16–22.

On June 6, 2008, the Physical Therapist noted that "symptomatic management of radiating pain

does not appear to be helpful" and recommended that after one more week of PT, Plaintiff should discontinue PT and return to his primary care physician for further medical evaluation and treatment. *Id.* at (unnumbered) p. 16. Approximately one week later, on June 11, the Physical Therapist made a similar notation. *Id.* at (unnumbered) p. 12.

On June 10, 2008, one day prior to his last physical therapy treatment, Plaintiff met with Dr. Miller. AHR at p. 19; Miller Aff. at ¶ 8. Plaintiff contends that at this appointment Dr. Miller informed him that he would schedule him for an appointment with a back specialist after his physical therapy had been completed. Compl. at ¶ 6(k). On, July 7, 2008, Plaintiff wrote to Dr. Miller informing him that his condition was deteriorating, and that he believed Dr. Miller was denying or delaying his medical care. Compl. at ¶ 6(l). On, July 8, Plaintiff and Dr. Miller met and discussed his back pain. AHR at p. 20. Dr. Miller noted that Plaintiff had "chronic back pain" and was "interested in surgery." *Id.* Dr. Miller proscribed an EMG nerve test,[2] and noted that he would refer Plaintiff to a neurosurgeon after the test was completed. *Id.*; Miller Aff., Ex. 3 at (unnumbered) p. 8.

On August 5, 2008, Plaintiff received an EMG nerve test at Albany Medical Center. AHR at p. 22; Miller Aff., Ex. 3 at (unnumbered) pp. 1–2 (hereinafter "EMG Report"). The EMG Report noted "a normal study" and did not reveal any "abnormalities that would be diagnostic for radiculopathy or peripheral neuropathy." EMG Report. Dr. Miller reviewed the EMG Report on August 5, and noted that a follow-up was needed with the patient's primary care physician. *Id.* at (unnumbered) p. 2. Dr. Genovese reviewed the same report on August 12 and noted that no further action was needed. *Id.* at (unnumbered) p. 1. On August 18, 2008, Plaintiff reported to sick-call

_____

[2] An EMG nerve test measures the conductivity of nerves, and can identify impingements that might impair the nerves function. Miller Aff. at ¶ 9.

complaining of severe back pain and was told that he would see a doctor after his family reunion scheduled for August 22.  Compl. at ¶ 6(q); AHR at p. 24.

On September 15, 2008, Plaintiff filed a grievance complaining that he requested a doctors appointment three weeks ago, but had not yet been seen; he had already languished in pain for more than a year in total; he needed to see a specialist the next day; and that his condition "has deteriorated as a result of this neglect and slow treatment."  Pl.'s Opp'n, Ex. 4, Inmate Grievance No. 24584, dated Sep. 15, 2008;Compl. at ¶ 6(s).  On September 8, and 22, Plaintiff reported to sick-call inquiring, *inter alia,* as to why he had not yet seen a doctor since making his request on August 18.  AHR at p. 25.  An appointment was made thereafter for September 30.  *Id.* at p. 25.

On September 30, Plaintiff met with Dr. Miller.  *Id.* at 27; Miller Aff. at ¶ 9.  Dr. Miller asserts that Plaintiff

> claimed to have difficulty standing for 5 to 6 min[utes]; however that claim did not appear consistent with anything that I saw.  He had apparently walked from his block to the infirmary.  He had then sat on a metal bench for however long it took before it was his turn.  My notes on his [AHR] reflect my observations that during my examination of him he was able to stand and move about without difficulty.  He was able to bend at the hip to 45°.  During most of the appointment he was seated, and was able to do so without any apparent difficulty.

Miller Aff. at ¶ 9.

Dr. Miller also noted that the results of Plaintiff's "EMG found nothing wrong with the nerves going into inmate Ramo's legs."  *Id.*  However, "because Inmate Ramos was complaining that he had pain in his legs and the MRI showed some degenerative changes even though the EMG showed no impairment of function or objective signs of pain, I referred him to a physiatrist."  *Id.* at ¶ 10.  Plaintiff contends that on September 30, Dr. Miller told him that he would send him "for neurology, physical medicine, rehabilitation, and . . . that [Plaintiff] had no back problems."  Compl. at ¶ 6(w).

On October 27, 2008, Plaintiff met with the Physiatrist.  AHR at p. 28.  The Physiatrist

recommended that Plaintiff consult a neurosurgeon and try Neurontin. *Id.* On October 28, Plaintiff met with Dr. Genovese. *Id.* at p. 29; Genovese Aff. at ¶ 17. Dr. Genovese reviewed the Physiatrist's recommendations with Plaintiff that he see a neurosurgeon and Plaintiff agreed to try Neurontin. AHR at p. 29; Genovese Aff. at ¶ 17. On November 3, Dr. Genovese proscribed Neurontin for Plaintiff and referred him to a neurosurgeon. AHR p. 30; Pl.'s Opp'n, Ex. 5. On November 6, Plaintiff refused Neurontin, and Dr. Miller signed off on the patient's refusal form. AHR at pp. 30 & 31; Miller Aff. at ¶ 13 & Ex. 4 at (unnumbered) p. 1. The AHR entry on November 6, notes that Plaintiff "has not come for neurontin since ordered," yet Plaintiff claims that he initially took the medication as prescribed and only refused it after he "began experiencing dizziness and feeling disoriented." Pl.'s Opp at p. 9; *accord* AHR at p.30.

On December 11, 2008, Plaintiff saw the Neurosurgeon. Comp. at 6(zb); AHR at p. 32; Miller Aff. at ¶ 14. The Neurosurgeon noted that Plaintiff "likely would benefit from surgery," and that an additional MRI should be taken because the last one was more than a year old, and that all films should be sent with Plaintiff for the follow-up visit. AHR at p. 32; Pl.'s Opp'n, Ex. 5; Miller Aff. at ¶ 14; Compl. at 6(zb). The Neurosurgeon recommended that the follow-up with Dr. German, another neurosurgeon, be conducted "soon." Pl.'s Opp'n, Ex. 5. On December 12, Dr. Miller reviewed the results of the neurosurgery consultation, and concurred with the Neurosurgeon's recommendation. Miller Aff. at ¶¶ 14 & 15; AHR at p. 32.

On December 29, Plaintiff went to sick-call to ask for a follow-up appointment with the doctor to discuss his neurosurgery consultation, and on the next day Plaintiff met with Dr. Genovese. Dr. Genovese ordered an MRI for Plaintiff, and noted that after the MRI Plaintiff would need a referral for a follow-up appointment with Dr. German. AHR at pp. 33-34; Genovese Aff. at ¶ 19.

On January 21, 2009, Plaintiff underwent another MRI ("2009 MRI"). Genovese Aff. at ¶ 19; AHR at p. 35. On February 2, Plaintiff met with Dr. Genovese, complained that he was experiencing pain, mostly while standing, and that he could not stand for more than five or six minutes at a time. Dr. Genovese discussed the results of Plaintiff's 2009 MRI, and submitted a request for a neurosurgery consultation, Genovese Aff. at ¶ 21; AHR at p. 36. On March 8 or 9, Plaintiff went to sick-call to inquire about when his neurosurgery consult would be scheduled and wrote a letter to Dr. Genovese complaining of the delay. Compl. at ¶¶ 6(zi) & (zj); AHR at p. 37. On March 12, Plaintiff saw a Neurosurgeon, Dr. Kuo, but Plaintiff's MRI films were not sent with him to the consultation. Compl. at ¶ 6(zk); Genovese Aff. at ¶ 23; AHR at p. 40; Pl.'s Opp'n, Ex. 9. Dr. Kuo noted that Plaintiff "will likely need decompression with fusion," and that he should continue PT. Pl.'s Opp'n, Ex. 6; AHR at p. 40. Dr. Kuo also requested that the patient undergo "flexion/ext x-rays," and he should bring those films, as well as copies of his existing MRIs to Dr. Deriso, German, or Seminoff in the neuro clinic for a spinal fusion surgery evaluation. AHR at p. 40; Pl.'s Opp'n, Ex. 9. Finally, Dr. Kuo asked that a follow-up appointment be arranged with him within five months. Genovese Aff. at ¶ 23; AHR at p. 40.

On April 13, 2009, Plaintiff went to sick-call to request medical attention "due to [his] continuous chronic back pain, numbness in [his] legs and not being able to stand longer than 5 minutes." Compl. at ¶ 6(zn); AHR at p. 39. On April 21, Plaintiff and Dr. Genovese discussed the fact that the MRI films had not been sent to the last consultation, and that the Neurosurgeon had requested a follow-up visit within five months. Genovese Aff. at ¶ 23; AHR at p. 40. Additionally, Dr. Genovese made a note that Plaintiff's MRIs should be sent to Dr. Deriso or Dr. Seminoff for a comparison study prior to his follow-up with the neurosurgeon. AHR at p. 40. Dr. Genovese

believes this is the last contact she had with Plaintiff before leaving Shawangunk to work at Sing Sing Correctional Facility in May of 2009. Genovese Aff. at ¶ 24.

On June 21 or 22, 2009, Plaintiff again went to sick-call, requested medical attention for his lower back pain, and asked about the status of the neurosurgery consultation that Dr. Genovese had recommended on April 21. AHR at p. 41; Compl. at ¶ 6(zp); Pl.'s Opp'n, Ex. 7. Plaintiff was informed that the request had been cancelled, but no reason was given. Pl.'s Opp'n, Ex. 7. On June 28, Plaintiff filed a grievance and in response thereto, he learned that Dr. Genovese had canceled the appointment "because she wanted to try other things." *Id.*; Compl. at ¶ 6(zr).

On July 21, 2009, Plaintiff met with Dr. Miller and told Dr. Miller that he had not yet met with the neurosurgeon for a follow-up of his March 12, 2009 neurosurgery consultation with Dr. Kuo. Miller Aff. at ¶ 15; AHR at p. 43. Dr. Miller submitted a request for a follow-up consultation with a neurosurgeon and added a note "to make sure that all MRI films go with the inmate to the appointment." Miller Aff. at ¶ 15; AHR at p. 43.

On September 10, one day after Plaintiff filed this civil rights Complaint, Plaintiff met with a Neurosurgeon, Dr. German, however, copies of his chest x-rays were sent to the appointment rather than the MRIs of his spine. Pl.'s Opp'n at p. 11 & Exs. 9–11; AHR at p. 45. On September 15, 2009, Plaintiff reported to sick-call requesting a follow-up regarding his neurosurgery consult with Dr. German. AHR at p. 45. On September 25, Plaintiff was x-rayed. Pl.'s Opp'n at p. 12. Thereafter, On December 10, Plaintiff met with Dr. German for his follow-up visit, who recommended that Plaintiff receive two epidural steroid injections ("ESI"), two weeks apart. Pl.'s Opp'n, Ex. 14; Miller Aff. at ¶ 17; AHR at p. 50. Plaintiff received his first ESI on April 28, 2010, at which time he claims he first "experienced any relief and real treatment." Pl.'s Opp'n at pp. 12,

14, & Ex. 15.

## B. Preliminary Procedural Issues

Before beginning our substantive discussion of Defendants' Motion for Summary Judgment, we address two important procedural issues that bear on the Motion.

First, in his Opposition, Plaintiff, for the first time, raises accusations regarding the care provided by Defendants for his psoriasis. *See* Pl.'s Opp'n at pp. 13-14. It is improper to raise new claims in opposition papers, therefore, Plaintiff's psoriasis claims will not be dealt with herein. *See In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y. 1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)); *Harvey v. New York City Police Dep't*, 1997 WL 292112, at *2 n.2 (S.D.N.Y. June 3, 1997) ("To the extent plaintiff attempts to assert new claims in his opposition papers to defendants' motion, . . . the Court finds that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment' and accordingly disregards such claims.") (citation omitted); *see also McChesney v. Bastien*, 2012 WL 4338707, at * 5 n. 14 (N.D.N.Y. Sept. 20, 2012 (surveying cases)

Second, in his Complaint, signed on September 9, 2009, Plaintiff alleged that Doe Defendant(s):[3] (1) denied requests for medical consultations with "ortho/neuro" surgeons; (2) delayed approving physical therapy treatments; (3) delayed Plaintiff's treatment by purposefully

---

[3] The exact number of Doe Defendants is unknown, however, it appears that Plaintiff intended to include unidentified persons from at least two distinct groups: (1) medical staff at Shawangunk who were responsible for administrative tasks at the facilities medical clinic; and (2) unidentified personnel at the Central Office Review Committee (CORC), who were responsible for reviewing inmate grievance appeals. Compl. at ¶¶ 3(f)–(g). Nonehteless, distinction aside, we refer to all as Doe Defendants, collectively.

failing to send Plaintiff's MRIs to outside specialists for use during Plaintiff's medical consultations; and (4) rubber-stamped "CORC" decisions in collusion with Department of Corrections officials in accordance with an unwritten policy designed to save the prison money by providing sub-standard care to inmates. Compl. at ¶¶ 3(f)–(g). We need not, and do not, determine any issue relative to Doe Defendants because these claims are otherwise barred.

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[4] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, dismissing the case without prejudice as to that defendant. *Id.*

Plaintiff was warned on three separate occasions by the Court that his claims against the Doe Defendants would be dismissed if he failed to properly identify and timely serve them. *See* Dkt. No. 4, Dec. and Order, dated Nov. 05, 2009, at p. 2; Dkt. No. 16, Report-Recommendation and Order, dated Jan. 03, 2011, at pp. 14-15; Dkt No. 22, Mem. Dec. and Order, dated June, 17, 2011, at pp. 6-7. While Defendants' Motion to Dismiss was pending, Plaintiff made a Motion seeking, *inter alia,* a continuation of discovery to allow him to ascertain the identity of the Doe Defendants. It is not clear whether any such measures were taken to achieve that goal - nor is this issue addressed in Plaintiff's Opposition papers. More than 120-days have elapsed, and Plaintiff has not identified the Doe Defendants. Moreover, Plaintiff is now precluded from amending his Complaint in order to identify these Defendants because the applicable three-year statute of limitations has now expired

---

[4] Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

and Plaintiff is not entitled to the benefit of the relation back doctrine. FED. R. CIV. P. 15(c); *see also Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993) (internal citations and quotation marks omitted). Plaintiff did not know the names of the actual parties at the time he filed his Complaint more than three and a half years ago, nor does he currently know them despite the passage of time, multiple warnings by the Court, and ample opportunity to conduct discovery. Therefore, in this case, any amended complaint would not relate back to the date the Original Complaint was filed. FED. R. CIV. P. 15(c); *Barrows v. Wethersfield Police Dep't,* 66 F.3d 466, 470 (2d Cir. 1994), *modified*, 74 F.3d 1366 (1996) ("Rule 15 (c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."). Thus, as a matter of law, Plaintiff is foreclosed from bringing any claim against the Doe Defendants directly for which the applicable statutory period of limitations has expired, and such claims should be dismissed with prejudice.

With the record now purged of irrelevant and untimely claims, we now consider whether there are any genuine issues of material fact regarding Plaintiff's remaining deliberate indifference claims against Dr. Genovese and Dr. Miller.

## C. Eighth Amendment

Plaintiff alleges that Dr. Genovese has: (1) personally and knowingly failed to provide him with adequate medical treatment, and (2) has failed, as the Supervisor of the Shawangunk Medical Unit, to correct the "medical failures [Plaintiff] has been subjected to" while at Shawangunk. Compl. at ¶ 3(b). As to Dr. Genovese's role as a supervisor, presumably, the medical failures to which Plaintiff refers include his allegations against the Doe Defendants that they denied him a medical consult with an "ortho/neuro surgeon," delayed his physical therapy treatments, and were

*-15-*

responsible for failing to send Plaintiff's MRIs to specialty consultations, thereby further delaying his medical treatment. Compl. at ¶ 3(f). Furthermore, Plaintiff claims that Dr. Miller personally denied and delayed his medical treatment, which caused or contributed to his chronic back pain and the further deterioration of his joints and muscles. *Id.* at ¶ 3(e).

As explained below, we find that based on the medical records, no reasonable juror could conclude that Plaintiff was denied medical care by any Defendant. Furthermore, although there is some evidence that Plaintiff's treatment was delayed, no genuine triable issue of fact exists with regard to whether the delay was sufficiently serious to support the objective element of Plaintiff's claim, nor whether Defendants acted with the requisite culpability to establish the subjective elements of deliberate indifference. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED**.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The seriousness element, which is an objective test determining whether a deprivation of care is sufficiently serious, "entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.

2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003); *see also Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one"). Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Smith v. Carpenter*, 316 F.3d at 185)). In such cases, courts "focus[] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.*

The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, such as criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to

*-17-*

support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted). Prison officials act with deliberate indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837).

Lastly, It is well settled that an individual cannot be held liable for damages under § 1983 merely because she holds a position of authority, but she can be held liable if she was personally involved in the alleged deprivation. The personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).

## 1. Objective Element

Other than Plaintiff's conclusory allegations that he was denied medical care by Defendants Miller and Genovese, there is nothing in the record to support such a claim. *See e.g.,* Compl. at ¶¶ 3(b) & (e). Here, Plaintiff presented with a history of pain caused by a degenerative spinal

condition, which he had been diagnosed with more than ten years prior. As established by portions of Plaintiff's Ambulatory Health Record, as well as Defendants' Affidavits, the record in this case clearly shows that during the period of his incarceration at Shawangunk relevant to the instant claim:

(1)    Plaintiff had regular and continuous appointments with Dr. Genovese, Dr. Miller, and other medical professionals both within Shawangunk and at outside facilities, *see* Genovese Aff. at ¶¶ 8, 12–15, 17, 19–23, & 25; Miller Aff. at ¶¶ 6–11, 14–15, & 19–20; *see generally* AHR;

(2)    he was provided with pain medication, Genovese Aff. at ¶¶ 17; AHR at p. 30;

(3)    Plaintiff was proscribed physical therapy, *see* Genovese Aff. at ¶ 15 & Ex. 3; Miller Aff., Ex. 3 at (unnumbered) pp. 12 & 16–22;

(4)    Defendants made referrals for specialty consultations with neurosurgeons and a physiatrist, *see* Genovese Aff. at ¶ 17 & 23; Miller Aff. at ¶¶ 10, 15, & Ex. 5 at (unnumbered) pp. 1 & 2; Pl.'s Opp'n, Exs. 5, 6, 9, & 15–18; and

(5)    Defendants ordered several diagnostic tests, including two MRIs, an EMG nerve test, and x-rays, Miller Aff. at ¶ 9; Pl.'s Opp'n at p. 12; Genovese Aff. at ¶¶ 15 & 19; 2007 MRI Report; EMG Report; AHR at pp. 7, 22, 35, 45, & 47.

Thus, we find that no rational juror could conclude Plaintiff was denied adequate medical treatment. Plaintiff's conclusory allegations are insufficient to raise any triable issue in light of the documentary case established by Defendants in this regard. *See Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003); *Salahuddin v. Goord*, 467 F.3d at 279–80; *see also Harrington v. Mid-State Corr. Facility*, 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) (finding that "[r]eferring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

Even when construed liberally, Plaintiff's claim could only sound in delay, and not denial

of treatment. The sum and substance of Plaintiff's Complaint is best captured by his own statement that "since October 7, 2007, when Plaintiff first complained [of back pain] . . . Plaintiff has had to wait a period of more than two years and a half in order to receive a treatment needed for his back[] . . . [and] it was not until [] Plaintiff received the injections for his back on April 28, 2010 . . . that Plaintiff experienced any relief and real treatment." Pl.'s Opp'n. at p. 14.

Therefore, in assessing the objective element of his claim our focus shifts from determining whether triable issues exist regarding the severity of the underlying medical condition alone, to determining whether any triable issue of material fact exists as to whether the deprivation – in this case the two and a half year delay – itself presented a seriousness risk of harm to Plaintiff. *See Salahuddin v. Goord*, 467 F.3d at 280; *Smith v. Carpenter*, 316 F.3d at 186. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter*, 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* Moreover, "[t]he absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue." *Id.*

Plaintiff has alleged that as a result of the delay in his treatment he was forced to endure unnecessary pain and suffering, and that his joints and muscles deteriorated. *E.g.*, Compl. at ¶ 3(e). Indeed, Plaintiff's lengthy and documented history of sick-call complaints, letters, and grievances

complaining of severe and chronic pain are sufficient to establish that his degenerative disc disease and severe chronic back pain is a serious underlying medical condition. *See Jordan v.Rabinowitz*, 2010 WL 4810229, at *6 (N.D.N.Y. Aug. 24, 2010) (collecting cases for the proposition that severe long-lasting back pain constitutes a serious medical need); *see also Rodriguez v. Smith*, 2011 WL 4479689, at *5 (N.D.N.Y. Aug. 19, 2011) (collecting cases); *see also Brock v. Wright*, 315 F.3d at 163 (overturning district court's ruling that pain caused by a keloid scar on the plaintiff's cheek was not a sufficiently serious medical need because "the district court either erred in not treating [plaintiff's claims of chronic pain] as true or [in] believ[ing] that only extreme pain or a degenerative condition would suffice to meet the legal standard").

Acknowledging that degenerative disc disease is a severe underlying medical condition notwithstanding, aside from Plaintiff's conclusory allegations, nothing in the record creates a triable issue of fact as to whether the delay put him at any serious risk of harm. His conclusory allegations that his muscles and joints further deteriorated as a result of the delay are insufficient standing alone to overcome the medical evidence provided by Defendants, which in this case shows that Plaintiff was no worse off at the end of the delay than he was at the beginning. For example, this is not a case in which because of deterioration that occurred during the delay, Plaintiff was precluded from receiving a type of surgery or some other helpful treatment which he would have been able to take advantage of but for the delay. *Cf. Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (finding that a failure to provide treatment to deteriorating teeth which arguably could have been saved but for the delay in treatment and were ultimately extracted was a sufficiently serious delay to survive a motion to dismiss).

Moreover, even if there were some evidence to raise a triable issue of fact on the grounds

that Plaintiff did indeed suffer some medical consequence or was put at a sufficiently serious risk of further harm as a result of the delay, Plaintiff's claim would still fail because we can find no triable issue of material fact with regard to the second element – whether Defendants acted with deliberate indifference.

## 2. Subjective Element

Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is typically reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition . . . or delayed major surgery[.]" *Freeman v. Stack*, 2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000).

At no point was Ramos's condition life threatening or fast degenerating. *Demata v. New York State Corr. Dep't of Health Serv.*, 198 F.3d 233 (2d Cir. 1999). Nor is this a case in which major surgery was delayed for over two years, or for that matter, at all. In fact, although some of Plaintiff's Neurosurgery Consultants stated that Plaintiff might benefit from or be a candidate for a surgical procedure, as of May 19, 2011, his Consultants were still prescribing pain management and physical rehabilitation rather than surgery. *See* Dkt. No. 34-5, Jennifer Gallagher Aff., dated June 1, 2012, Ex. A. In fact, surgery has never actually been prescribed for Plaintiff. Moreover, Plaintiff's refusal of Neurontin after it was prescribed to him for pain by Dr. Genovese on November 3 further weakens his claims (even despite his alleged adverse reaction to the medication). He cannot on the one hand refuse to take pain medication prescribed by his doctor and then on the other sue her because she did not relieve his pain. *See Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (affirming lower court ruling that a prisoner who declines medical treatment

cannot establish an Eighth Amendment claim for medical deliberate indifference).  Furthermore, while the failure to provide PT or injections earlier might potentially constitute negligence or even medical malpractice, it is not so egregious, shocking, or repugnant as to merit the invocation of the Eighth Amendment.  *See Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992); *Chance v. Armstrong*, 143 F.3d at 702; *Demata v. New York State Corr. Dep't. of Health Serv.*, 198 F.3d 233 (finding that the fact plaintiff felt "something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim") (citation omitted).

Nor does Plaintiff make any allegation that Dr. Miller or Dr. Genovese ever delayed his treatment as a form of punishment.  The only allegation that comes even remotely close is Plaintiff's claim that Doe Defendants purposefully failed to send his MRIs to specialist consultants due to "problems" he was having with them.  *See* Pl.'s Opp'n, Ex. 11 (stating that he believes his MRIs are being "intentionally [withheld] due to problems [he has] had and/or [is] having with the medical staff[].").  Allegations of repeated failures to send medical records may form the basis for a claim that the MRIs were intentionally delayed.  *Abdush-Shahid v. Coughlin,* 933 F. Supp. 168, 182 (N.D.N.Y. 1996) (collecting cases for the proposition that a series of failures, such as repeated failures to deliver medical records, could lead rational fact finders to conclude that a delay was intentional).  However, in terms of supervisory liability, Dr. Genovese left the Shawangunk facility in May of 2009 to take a job at Sing Sing Correctional Facility.  Therefore, only the March 12, 2009 incident, when records were not forwarded to the Consultant, occurred during her tenure at Shawangunk.  Thus she could not have been aware of the other two similar incidents.  Accordingly, no rational juror could conclude that she was aware of a pattern of repeated failures, or find that she had a responsibility to take any type of corrective action to ameliorate those failures, or, if she did

know, that she acted with deliberate indifference. *Cf. Pabon v. Goord*, 2003 WL 1787268 (S.D.N.Y. Mar. 28, 2003) (granting summary judgment where plaintiff's conclusory allegations that defendant had purposefully delayed his treatment by withholding medical records from specialists were unsubstantiated by the record).

Furthermore, upon learning of the failure which occurred on March 12, Dr. Genovese took reasonable corrective action – she made a specific note in the AHR that the MRIs needed to be sent with Plaintiff on any subsequent appointments. Dr. Genovese cannot be found liable merely because she was the Facility Supervisor. *See Colon v. Coughlin*, 58 F.3d at 873. Similarly, Dr. Miller cannot be held liable for the Doe Defendants' actions because he was not a supervisor at all, nor was he personally involved in withholding the records. *See id.* ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citations omitted).

Therefore, because no triable issues of fact exist regarding whether the alleged delay in Plaintiff's treatment presented a sufficiently serious deprivation for purposes of establishing the objective element, nor as to whether either Defendant acted with deliberate indifference, we recommend that Defendants' Motion for Summary Judgment be **GRANTED.**

### D. Qualified Immunity

Because we can find no evidence of an Eighth Amendment violation by Defendants, we need not, and do not, address qualified immunity.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 34) be

**GRANTED**; and it is further

  **RECOMMENDED**, that Plaintiff's claims against Doe Defendants be **DISMISSED WITH PREJUDICE.**

  **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

  Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).


Date: January 18, 2013
   Albany, New York


Randolph F. Treece
U.S. Magistrate Judge

-25-